```
                    UNITED STATES DISTRICT COURT
                       DISTRICT OF NEW JERSEY


GLENN D. MORRIS,                    :
                                    :      HONORABLE JOSEPH E. IRENAS
          Plaintiff,                :
                                    :      CIVIL ACTION NO. 04-4678 (JEI)
     v.                             :
                                    :              OPINION
CORNELL & COMPANY,                  :
                                    :
          Defendant.                :
```

**APPEARANCES:**

Glenn Morris, plaintiff *pro se*
52 Gates Avenue
Montclair, New Jersey 07042

CUYLER BURK, LLP
By: Andrew K. Craig, Esq.
Four Century Drive
Parsippany, New Jersey 07054

KAUFF, McCLAIN & McGUIRE LLP
By: Kenneth A. Margolis, Esq.
950 Third Avenue, Suite 1400
New York, New York 10022
     Counsel for Defendant.


**IRENAS**, Senior District Judge:

   Plaintiff Glenn D. Morris ("Morris") brings the instant action against his former employer, Defendant Cornell & Company ("Cornell"), alleging race discrimination, age discrimination and retaliation in violation of Title VII of the Civil Rights Act of

1964 ("Title VII"),[1] and the Age Discrimination in Employment Act ("ADEA").[2] Cornell moves for summary judgment.

## I.

Morris, a forty-seven year old African American man, joined the District Council of Northern New Jersey Ironworkers ("Union") apprenticeship training program in September, 2000.  During the three to four year training program, apprentices receive training from the District Council at specific training sites, and also assist journeymen and foremen at actual job sites.

Cornell, a construction firm in the business of erecting steel and concrete structures, was subcontracted to erect the steel framework of the Goldman Sachs Building ("the Project"), located on the Hudson River across from New York City in Jersey City, New Jersey.  Steel erection of the project commenced in June, 2001, and continued through June, 2003.  When the Project began, Cornell initially employed six ironworkers at the site.  As the construction progressed, Cornell gradually hired more workers, reaching a peak of 114 journeymen, 20 foremen and 18 apprentices hired to work daily on the Project in April, 2002.

---

[1] 42 U.S.C. § 2000e.

[2] 29 U.S.C. §§ 621-634.

2

Cornell hired Morris as an apprentice in September, 2001. At that time, eight apprentices had been previously hired to work on the Project. Morris was first assigned to a "bolting-up" gang and later to a "fieldwork" gang.[3] During his tenure on the project, Morris claims that his "upward mobility" as an apprentice was hindered by the discriminatory motives of supervisors and management when they did not allow him to work in a variety of capacities on the project or provide him with proper on the job training.

Morris temporarily lost his job with Cornell in May, 2002. Cornell claims that the termination was due to Morris's absenteeism, although Morris insists that the termination was the continuing result of a discriminatory work environment. During this hiatus from work, Morris went to the union hall to find work, as he was required to do according to the terms of the apprenticeship program. While at the hall, Morris informed a secretary that he was terminated based upon his race, however, he did not file any formal complaints or reports based on the allegations. Morris was rehired by Cornell approximately a week later.

---

[3]Work in the "bolting-up" gang consists of inserting by hand and machine-tightening hundreds of thousands of bolts to support the steel framework of the project. The "fieldwork" gang is responsible for cleaning up the construction site and assisting journeymen and foremen in their work.

Cornell laid off Morris on or about January 24, 2003. At that time, the Project was nearing completion, with a projected completion date in June, 2003, and twenty-four ironworkers were employed, including four apprentices. After Morris and four other employees were laid off (one apprentice and three journeymen), nineteen employees remained, including two apprentices. The two remaining apprentices were both younger than Morris and Caucasian. Upon the completion of the project on June 20, 2003, all remaining employees were laid off. In all, thirty-three apprentices were employed by Cornell during the course of the Project, at least twenty of which were laid off due to decreasing workloads.

Cornell maintains that it used the performance evaluations from October 29, 2002, to decide which apprentices would be laid off or retained after January 24, 2003. These performance evaluations were completed for each of Cornell's apprentice employees, on which work habits, attitude, attendance, punctuality and other general comments were recorded. Morris received satisfactory evaluations during the period leading up to his lay off. The two apprentices who were retained by Cornell yielded higher marks in productivity and in other areas on the October 29, 2002, evaluations.[4] Morris asserts that the

---

[4] In September, 2003, Morris was terminated from the District Council's apprenticeship program based on negative performance evaluations he received while in the program. These evaluations were from multiple employers.

4

performance evaluations were merely pretexts for Cornell's discriminatory motives.

Morris filed charges against Cornell with the Equal Employment Opportunity Commission on or about October 30, 2003. He received a right to sue letter on or about June 24, 2004. Morris timely filed the instant Complaint in this Court on September 20, 2004.

## II.

"Under Rule 56(c), summary judgment is proper 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (quoting Fed. R. Civ. P. 56(c)).

The court must construe the facts and inferences in a light most favorable to the non-moving party when deciding a motion for summary judgment. *Pollock v. Am. Tel & Tel. Long Lines*, 794 F.2d 860, 864 (3d Cir. 1986). The role of the court is to determine whether there is a genuine issue for trial, not "to weigh the evidence and determine the truth of the matter. . . ." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). "[A]

5

party opposing a properly supported motion for summary judgment may not rest upon the mere allegations or denials of his pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial." *Id*. at 248.

### III.

The Court employs the *McDonnell Douglas-Burdine* burden shifting framework at the summary judgment stage when analyzing employment discrimination claims based on circumstantial evidence.[5]  *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973); *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 255 (1981).  The *McDonnell Douglas* framework also applies to ADEA actions.  *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142 (2000).

A plaintiff alleging workplace discrimination must establish his prima facie case by a preponderance of the evidence.  *St.*

---

[5] Title VII provides that: "it shall be unlawful for an employer to discharge or to discriminate against any individual with respect to his compensation, terms, conditions or privileges of employment because of such individual's race, color, religion, or [other protected characteristic.]" *Teamsters v. United States*, 431 U.S. 324, 335-36, (1977) (citation omitted).  Furthermore, it "shall be an unlawful employment practice for an employer to discriminate against any of his employees because he has made a charge under this subchapter."  42 U.S.C. § 2000e-3a.
   Under the ADEA it is "unlawful for an employer to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age."  28 U.S.C. § 623(a)(1).

6

*Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506 (1993). The evidentiary burden at the prima facie case stage is rather modest: it is "to demonstrate to the court that the plaintiff's factual scenario is compatible with discriminatory intent – i.e., that discrimination could be a reason for the employer's action." *Marzano v. Computer Sci. Corp. Inc.*, 91 F.3d 497, 508 (3d Cir. 1996). The Court must consider only the evidence adduced by the plaintiff at this stage. *Siegel v. Alpha Wire Corp.*, 894 F.2d 50, 54 (3d Cir. 1990). The Court will consider the defendant's efforts to dispute the plaintiff's prima facie case at a later stage of the *McDonnell Douglas* framework. *Id*. at 54.

"The facts necessarily will vary in [employment discrimination] cases, and the specification above of the prima facie proof required from [a plaintiff] is not necessarily applicable in every respect due to differing factual situations." *Mosca v. Cole*, 384 F. Supp. 2d 757, 762 (D.N.J. 2005)(quoting *McDonnell Douglas*, 411 U.S. at 802). Generally, to show a prima facie case the plaintiff must establish that: (1) he is a member of a protected class; (2) he suffered an adverse employment decision; and (3) non-members of the protected class were treated more favorably. *McDonnell Douglas*, 411 U.S. at 802. Once the plaintiff has successfully established each prong, a presumption of discriminatory intent on the part of the defendant arises. *Burdine*, 450 U.S. at 254.

This presumption places upon the defendant the burden of adducing evidence that the adverse employment action was taken for a "legitimate, nondiscriminatory reason." *Id.* Through admissible evidence, the defendant must set forth reasons for its actions that, if believed by the trier of fact, "would support a finding that unlawful discrimination was not the cause of the employment action." *St. Mary's Honor Ctr.*, 509 U.S. at 507. Once the defendant has adduced this evidence, the presumption is rebutted and the plaintiff has the opportunity to demonstrate that "the proffered reason was not the true reason for the employment decision," and was a pretext for unlawful discrimination. *Burdine*, 450 U.S. at 255.

In *Fuentes v. Perskie*, the Third Circuit explained that

> "the plaintiff cannot simply show that the employer's decision was wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise shrewd, prudent, or competent. Rather the . . . plaintiff must demonstrate such weakness, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence."

32 F.3d 759, 765 (3d Cir. 1994) (internal citations omitted). A plaintiff can survive summary judgment by pointing to evidence that could lead a reasonable factfinder to either disbelieve the employer's articulated legitimate reasons or believe that an invidious discriminatory reason was the more likely motivating

cause of the employer's action.  *Mosca*, 384 F. Supp. 2d at 763 (citing *Fuentes,* 32 F.3d at 764).

While the burden of production in the *McDonnell Douglas* framework switches from the plaintiff to the defendant and back, "the ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff."  *Burdine*, 450 U.S. at 253.

### A.

Morris contends that the termination of his employment was motivated by animus based upon his race and age.  To establish a prima facie case for disparate treatment he must show that: (1) he belongs to a protected class; (2) he was performing his job at a level that met his employer's legitimate expectations; (3) he suffered an adverse employment action; and (4) others not within the protected class did not suffer similar adverse employment action.  *McDonnell Douglas*, 411 U.S. at 802; *Keller v. ORIX Credit Alliance, Inc.*, 130 F.3d. 1101, 1108 (3d Cir. 1997).  The Third Circuit has relaxed the fourth prong of the prima facie case in the reduction in force situation, so that a plaintiff whose position was eliminated need not show that he or she was replaced, but must show that the employer retained someone outside of his protected class.  *Marzano*, 91 F.3d at 503.

9

Here, it is uncontested that Morris was a member of a protected class, as he is African American and over forty years of age.[6] Cornell also does not challenge that Morris met its legitimate expectations or that Morris suffered an adverse employment action.  The two apprentices retained by Cornell after Morris was laid off were younger and Caucasian, and thus not members of his protected class.

Even if the Court accepts that the retention of two younger Caucasian apprentices is sufficient to satisfy the fourth prong of his prima facie case, Morris cannot demonstrate that Cornell's proffered legitimate, non-discriminatory reason for his termination is pretextual.  Cornell contends that Morris was laid off due to lack of work, and that its decision was based upon relative productivity of the remaining apprentices.

It is undisputed by both parties that the project as a whole was progressing toward completion in June, 2003, and that employees were laid off as various stages of construction were completed and the workload decreased.  Furthermore, Morris had remained after numerous layoffs of apprentices in the time leading up to his termination, in which employees not within his protected classes were laid off.  Specifically, thirteen of the seventeen apprentices laid off before Morris were Caucasian, one was Arab-American, one was Hispanic, and only two were African

---

[6] 29 U.S.C. § 631(a).

American.  Of the seventeen apprentices laid off before him, all were younger than Morris.  The two remaining apprentices, both younger than Morris and Caucasian, were laid off by Cornell after the completion of the project in June 2003.

No one was hired to fill Morris's position, nor has Morris presented any evidence that the two apprentices retained by Cornell were less qualified than he.  On the other hand, Cornell has produced the productivity reports showing that the two retained apprentices were more favorably evaluated on their reports.  Morris does not contest the accuracy of the October 29, 2002, productivity reports.

Instead, Morris alleges that his seniority over the two remaining apprentices is proof of discriminatory motive behind Cornell's layoff decision.  Morris adduces no evidence that seniority was ever a factor in Cornell's layoff policies.  Indeed, Cornell, has put forth evidence explicitly stating that seniority is never a factor in layoff decisions and that productivity reports are given sole determinative weight.[7]  *See*

---

[7] The affidavit of Thomas W. Jankiewicz ("Jankiewicz"), the General Foreman in charge of manpower for Cornell the Project outlined the lay off policy when the work load of the company is reduced:
> Seniority is not a factor that is taken into account when laying off ironworker apprentices (or journeymen, for that matter).  Only productivity is considered, or where applicable, if an apprentice volunteers to be laid off when a layoff of someone is necessary . . . of the four remaining apprentices, none volunteered to be laid off and so a choice had to be made.

(Def. Br., Jankiewicz Aff., at 5.)

11

*Simpson v. Kay Jewelers*, 142 F.3d 639, 647 (3d Cir. 1998)("the focus is on the particular criteria or qualifications identified by the employer as the reason for the adverse action.  The employee's positive performance in another category is not relevant, and neither is the employee's judgment as to the importance of the stated criterion.").

As Morris has not demonstrated any "weakness, implausibilities, inconsistencies, incoherencies, or contradictions" in Cornell's stated reason that would allow this Court could conclude that Cornell's explanation of his termination is "unworthy of credence."  Summary judgment will be granted for Cornell on the Title VII and ADEA discriminatory discharge claims.  *Fuentes*, 32 F.3d at 765.

B.

Morris also contends that he was terminated in retaliation for his complaint of race discrimination to the union secretary.[8]  The pertinent provision of Title VII provides that: "[i]t shall be an unlawful employment practice for an employer to discriminate against any of her employees . . . [because] the employee has opposed any practice made an unlawful employment practice by this subchapter."  42 U.S.C. § 2000-e3(a).  A plaintiff may establish a prima facie claim of retaliatory

---

[8]Morris brings his retaliation claim under Title VII only and not the ADEA.

12

discharge by demonstrating that: (1) he engaged in a protected activity known to the employer; (2) he was subjected to adverse employment action by the employer; and (3) there was a causal link between the protected activity and the adverse employment action. *Grazioli v. Genuine Parts Co.,* 409 F. Supp. 2d 569, 581 (D.N.J. 2005) (citing *Woodson v. Scott Paper Co.*, 109 F.3d 913, 920 (3d Cir. 1997)).

Even if the Court assumes that Morris's complaint to a secretary at the union hall is protected conduct, he is unable to establish a prima face case of retaliation because he has not proven that his employer knew of his assumed protected activity or that a causal connection exists between his assumed protected activity and the adverse employment action. *Grazioli*, 409 F. Supp. 2d at 581 (holding that an inference of causation in a retaliatory claim is warranted when supervisor's were aware of the hostile work environment, considered together with evidence of temporal proximity and hostility in the work environment).

Morris never complained directly to Cornell, the only defendant in this action, that he was being discriminated against on the basis of his race or age. (Morris Dep., at 56-59.) When asked if there was any evidence or facts to suggest that Cornell had any knowledge of his complaints, Morris could only speculate that the union "likely" informed Cornell of his unofficial

13

complaints.  (*Id*. at p. 59).  He adduced no evidence to show that Cornell knew he had complained to the union secretary.

Even if Morris could demonstrate that Cornell was aware of his complaint to the union secretary, he cannot establish that complaint was causally related to his lay off, either through proof of temporal proximity or a pattern of antagonism.  Temporal proximity is an obvious method by which a "plaintiff can proffer circumstantial evidence" of discriminatory intent.  *Kachmar v. SunGard Data Sys., Inc.*, 109 F.3d 173, 177 (3d Cir. 1997). However, Morris claims that his January, 2003, layoff was the result of his unofficial complaints to the union in May, 2002. This eight month gap does not support a reasonable inference of retaliatory motive.  *See Kachmar*, 109 F.3d 173, 177.  Nor has he presented circumstantial evidence of a "pattern of antagonism" following the protected conduct.  *Kachmar*, 109 F.3d at 177.

Morris contends that there was a pattern of antagonism leading up to his being laid off by Cornell that may suggest that retaliation was the true motive for his termination.  However, Morris does not suggest that the antagonistic treatment by Cornell was a result of his May, 2002, complaint, but in fact states that such treatment occurred throughout his employment with them, both before and after his complaint in May, 2002. Even if the court were to accept his unsupported allegations, this treatment, while unfortunate, does not support Morris's

claim of retaliatory discharge in response to his May, 2002, complaint because the alleged "pattern" of antagonism began before the alleged protected conduct.  *Cf. Robinson v. Southeastern Pa. Transp. Auth*., 982 F.2d 892 (3d Cir. 1993) (holding that a plaintiff can establish a link between his or her protected behavior and subsequent discharge if the employer engaged in a pattern of antagonism in the intervening period).

Accordingly, summary judgment is warranted on Morris's retaliation claim because Morris has failed to put forth sufficient evidence of pretext or a causal connection between his protected conduct and the alleged retaliation.

**IV.**

For the reasons set forth above, the Court will grant Defendant Cornell's Motion for Summary Judgment.  The Court will enter an appropriate order.

Date: August  16 , 2006

s/*Joseph E. Irenas*
JOSEPH E. IRENAS
Senior United States District Judge

15